IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| EMMITT HUMPHREY, ) | |
| as personal representative of the ) | |
| Estate of Shane Humphrey ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.04-CV-339 C (M) |
| ) | |
| v. ) | |
| ) | |
| RONNIE LEATHERMAN, individually ) | |
| and in his official capacity, and ) | |
| THE CITY OF TULSA, OKLAHOMA, ) | |
| ) | |
| Defendants, ) | |

**MOTION IN LIMINE OF THE PLAINTIFF
AND SUPPORTING BRIEF SEEKING TO EXCLUDE OPINIONS OF
<u>DR. WILLIAM JOSEPH LEWINSKI</u>**


R. THOMAS SEYMOUR, OBA #8099
C. ROBERT BURTON, OBA #14195
SCOTT A. GRAHAM, OBA # 19817
**THE SEYMOUR LAW FIRM**
100 West 5th Street, Suite 550
Tulsa, Oklahoma 74103
(918) 583-5791
-and
John C. Harris
P.O. Box 52206
Tulsa, Oklahoma 74152
(918) 447-2747

ATTORNEYS FOR PLAINTIFF

July 1, 2005

TABLE OF AUTHORITIES

| CASES | PAGE |
|---|---|

Aguilar v. Dixon, 1995 WL 319621 (N.D.Ill. 1995) ............................................................15, 16

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ........................1, 3, 4, 12, 16

Dean v. Watson, 1995 WL 692020 (N.D. Ill. 1995) ..............................................................11, 12

Dodge v. Cotter Corp., 328 F.3d 1212, 1225-26 (2003) ................................................................4

Gates v. The City of Memphis, 210 F.3d 371, 2000 WL 3777343 (6th Cir. 2000) .......................10

General Electric v. Joiner, 118 S.Ct. 512, 519 (1997) ..............................................................4, 12

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999) .............................................................3

Macsenti v. Becker, 237 F.3d 1223, 1230-34 (10th Cir 2001) ........................................................3

United States v. Call, 129 F.3d 1402, 1405 (10th Cir. 1997) ..........................................................4

TABLE OF CONTENTS

PAGE

I.  *Introduction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. *The Legal Standards Regarding The Admissibility of Expert Opinions* . . . . . . . . . . . . . . 3

III. *Lewinski Lacks The Requisite Credentials to Testify as to the Trajectory of the Shots Fired, the Position of the Parties at the Time of the Shooting, and the Nature of the Wounds* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV. *Lewinski's Opinions Are Speculative and Entirely Unsupported by Scientific Knowledge or Grounded In The Methods and Procedures of Science* . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  *Body Positions-Time of the Shooting* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.  *Shot Order & Entry Wounds of the Shots* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V. *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Plaintiff, Emmitt Humphrey, as personal representative of the Estate of Shane Humphrey ("Humphrey"), moves to exclude all the "expert" opinions of Dr. William Joseph Lewinski ("Lewinski"), set forth in his expert report (save and except his opinion that an average officer will discharge ten (10) rounds from a firearm in a time of two and one half to three seconds)[1], on the basis that: i) Lewinski is not an expert in forensics, ballistics, firearms, trajectory analysis, or anatomy and thus lacks the requisite credentials to testify as to the trajectory of the shots fired, the position of the bodies at the time of the shooting, and the nature of the wounds; ii) Lewinski's opinions are not based on scientifically valid principles and therefore, do not meet the reliability requirements of FRE 702; iii) Lewinski's opinions are speculative and entirely unsupported by scientific knowledge or grounded in the methods and procedures of science; and iv) Lewinski's opinions are not the product of reliable principles and/or methods.

I.   *Introduction*

The Plaintiff's son, Shane Humphrey, was shot eight times in the rear and killed by Officer Ronnie Leatherman ("Officer Leatherman"), with a fence between them, as Shane Humphrey was attempting to flee. An extensive number of police officers were called to the scene and there was little probability that Mr. Humphrey, on foot, could have avoided capture. The violent shooting death was the end result of what initially started as a traffic stop for a misdemeanor traffic code violation of a non-working headlight.

---

[1] This opinion is set forth in ¶ 5 of Lewinski's expert report. This opinion is of very marginal (if any) assistance to the trier of fact to understand the evidence or to determine a fact in issue. Daubert, 509 U.S. at 591. The court may very well decide to preclude this opinion on that basis. The investigating detectives, in this case, timed and video-taped a firearms instructor and a detective taking turns firing ten (10) rounds from the pistol that Officer Leatherman fired on the night he shot and killed Mr. Humphrey. These tests disclosed that the firearms instructor accomplished the task in 2.5 seconds the first time and 1.7 seconds during the second attempt and that the detective fired ten (10) rounds in 2.4 seconds during his one and only attempt.

Lewinski, as set forth in his "expert" report, has been designated to render various "opinions". These opinions include:

i) "[a] very plausible scenario is one where Mr. Humphrey, with his right hand, is pulling on Officer Leatherman's left arm while Mr. Humphrey is leaning away from and pulling away from Officer Leatherman. This scenario would place the right side and right rear of the trunk of Mr. Humphrey's body at a 4 to 6 foot distance away from the muzzle of Officer Leatherman's gun at the time of the discharge of the first rounds. It would also place Mr. Humphrey's inside and the back of his left thigh at a distance of 5 to 6 feet or more away from the muzzle of Officer Leatherman's gun." (Lewinski Expert Report, ¶ 3, attached hereto as Exhibit "1");

ii) "[t]he shots entering Mr. Humphrey[']s left leg, #6, #7, #8 would be [the] first shots fired and would be consistent with the position of Mr. Humphrey outlined in paragraph three of this report. These rounds would occur while Mr. Humphrey still had a grasp of Officer Leatherman's wrist and while in a position where Mr. Humphrey's left leg is approximately 6 feet from the muzzle of Officer Leatherman's gun. These shots/wounds would be followed by wounds #4 and #3, which would occur right after Mr. Humphrey had released his grip on Officer Leatherman and was taking his first step away from Officer Leatherman. Wounds number 1 and #2 would follow immediately afterward and depending upon the speed with which Mr. Humphrey is moving could also occur at the end of Mr. Humphrey's first step away from Officer Leatherman and within a second and a half of his release of Officer Leatherman's arm." (Lewinski Expert Report, ¶7, attached hereto as Exhibit "1");

iii) "[t]he first rounds fired by him occurred while he was still in the grasp of Mr. Humphrey and hit Mr. Humphrey in his left leg. The remainder of the rounds fired by Officer Leatherman occurred while Mr. Humphrey was taking one step away from Officer Leatherman." (Lewinski Expert Report, ¶ 9, attached hereto as Exhibit "1"); and

iv) "[o]fficers who are shooting to 'save their lives' fire slightly more rounds and for a longer period of time than officers who are 'shooting to stop'. This is the result of their focus of attention on trying to shoot to survive instead of noticing the details of the subject behavior. . .This focus of concentration on shooting to save his life during this brief shooting means that it is going to take him slightly longer to notice a change in Mr. Humphrey's behavior and body position before he stops shooting." Lewinski Expert Report, ¶ 6, attached hereto as Exhibit "1").

2

II.     *The Legal Standards Regarding The Admissibility of Expert Opinions*

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), the Supreme Court held Federal Rule of Evidence 702 requires the trial court to ensure any scientific testimony offered under the rule is "not only relevant, but reliable." 509 U.S. at 589. In <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999), the Supreme Court significantly clarified the scope of <u>Daubert</u> holding that the Fed.R.Evid. 702 gatekeeping duties of the trial court apply to all expert testimony, whether such testimony is based on scientific, technical or other specialized knowledge. Thus, under <u>Daubert</u>, the district court performs a critical and important gatekeeping role in assessing scientific evidence. <u>See</u> <u>Macsenti v. Becker</u>, 237 F.3d 1223, 1230-34 (10th Cir 2001) (discussing the district court's gatekeeping function under <u>Daubert</u>).

The <u>Daubert</u> standard ensures that the proffered evidence is both "reliable" and "relevant" 509 U.S. at 589. "Reliability" is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." <u>Id</u>. at 592-93. "Relevance" depends upon "whether [that] reasoning or methodology properly can be applied to the facts in issue." <u>Id</u>. at 593. In <u>Daubert</u> the Court explained the "reliability" prong of Rule 702:

> The subject of an expert's testimony must be 'scientific. . .knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation. . .In order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation-i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability. 509 U.S. at 589-90.

Generally, the district court should focus on the experts' methodology rather than the conclusions that they generate. Moreover, "[t]rained experts commonly extrapolate from existing data. But nothing. . .requires a district court to admit opinion evidence which is connected to existing data only by the

3

*ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Electric v. Joiner, 118 S.Ct. 512, 519 (1997).

The district court should "carefully and meticulously review" the proposed opinions of Dr. Lewinski. See United States v. Call, 129 F.3d 1402, 1405 (10th Cir. 1997) (internal quotation marks omitted) ("The analysis outlined in Daubert is extensive, requiring the district court to carefully and meticulously review the proffered scientific evidence."). In connection with fulfilling its gatekeeping responsibility under Daubert, the district court should "make adequate findings on the record to assure that the expert testimony offered [is] both relevant and reliable, and that the particular opinions [are] based on valid reasoning and reliable methodology." Dodge v. Cotter Corp., 328 F.3d 1212, 1225-26 (2003).

III.    *Lewinski Lacks The Requisite Credentials to Testify as to the Trajectory of the Shots Fired, the Position of the Parties at the Time of the Shooting, and the Nature of the Wounds*

Lewinski, in his deposition, testified in regard to his knowledge, skill, experience, training, and education that:

    i) *he has absolutely no training or education in forensic shooting reconstruction*; (Lewinski Dep., p. 16, lines 17-19, attached hereto as Exhibit 2);

    ii) *he has never been responsible for investigating or processing a crime scene where a shooting has occurred* (Id. lines 22-25; and p. 17, lines 1-9);

    iii) *he has absolutely no training or education in the microscopic examination of bullet holes*; (Id. p. 17, lines 10-12);

    iv) *he has not taken any post-secondary education courses in physics*; (Id. p. 17, lines 13-15); and

    v) *he has not taken any post-secondary education courses in physiology or anatomy at a university*; (Id. p. 17, lines 16-21).

Lewinski's educational background is relegated solely to psychology and sociology and, as articulated in his "expert" report, his field of expertise is in the area of "biomechanics" with studies involving "investigation into the perceptual and psychological factors that impact on an officer's perception and reaction time." (Lewinski Expert Report, pp.1-2, attached hereto as Exhibit "1"). In his deposition Lewinski readily admits that "I make no claim of being a biomechanics specialist other than in the area of lethal force encounters. We use the term 'biomechanics' simply to describe the action of rotation motion which is my area of study." (Lewinski Dep., p. 19, lines 20-23). And, that his area of "expertise" is in the field of biomechanics in the limited area of the range of motion of a human firing a gun in the context of lethal force. (Id. p. 20, lines 9-23).

The publications that Lewinski has authored and/or co-authored all involve the limited study of the action/reaction mechanics of body movement and reflect absolutely no foundational knowledge, skill, or experience for his substantive opinions concerning the "scenario" of the body positions of Officer Leatherman and Humphrey at the time of the shooting (¶ 3, Expert Report), and the specific chronological shot order and corresponding entry wounds of the shots (¶ 7 & ¶ 9, Expert Report).

-***Article I*** ("The Suspect Is Shot In the Back: Is Your Shooting Clean"), *The Police Marksman*, September/October 1999

In this article, Lewinski reported his findings in connection with utilizing a time-coded videotape to record "exactly how long it takes 'suspects' to turn away from a stationary starting position, as if turning away from an officer who was attempting to deal with them." The article reported that "[r]egardless of what angle or position the 'suspect' started from, they could initiate and complete the turn very quickly. In fact, the average 'suspect' standing full-front toward the camera/officer took about ½ second (.50 second) to complete a 180-degree turn. The fastest time was about 1/3 second

5

(.33 second)." (Article I, p. 23-4 (p.3-4), attached hereto as Exhibit 3).  As further explained in his deposition:

> Q. (By Mr. Burton) The work that you did in connection with the area that you were investigating as part of your specialization was focusing on the movement of an individual correct?
> A. Yes. That study was a movement, that's correct.
> \* \* \*
> Q. And there was no attempt to undertake any scientific or other investigative analysis with respect to issues associated with the firing of the gun, the trajectory of the bullet leaving the firing of the gun or anything to do with that area, correct?
> \* \* \*
> A. The lab would like to isolate out certain factors so you can study those factors.
> Q. And the factors that you were isolating out were the factors associated with the range of motion movement?
> A. And timing of that movement that's correct.

(Lewinski Dep., p. 29, lines 9-13, & 20-24; p.30, lines 2-6, attached hereto as Exhibit 2).

-***Article II*** ("Why Is The Suspect Shot in the Back"), *The Police Marksman*, November/December 2000

In this article, Lewinski stated that: "[t]he purpose of both the current and previous research was not to replicate any specific shooting situation, for this would be functionally impossible. . .Instead, the approach was to begin to come to an understanding of some of the time parameters of the specific motions studied, . . .This is not a study on the biomechanics of shooting. . .I was simply concerned with beginning to define the time parameters so the law enforcement community can know how fast these motions really can be." (Article II, p. 20 (p.2), attached hereto as Exhibit 4).  As further explained in his deposition:

> Q. (By Mr. Burton) And when you wrote this you meant what you said that quote, "This is not a study on the biomechanics of shooting"?
> A. Biomechanics referring to the traditional study of biomechanics. We refer to biomechanics as how people are turning versus the traditional study of biomechanics which is action and

6

>force generated. We're looking at the external portions of the body and how the body is moving and how quickly it moves within a particular time frame. So, for instance, we're looking at how quickly the hip rotates when someone is pulling away from an officer and pointing back. We're looking at the different parts. And that's our timing element. That's also what I'm referring to today is the biomechanics or motion analysis or how that motion is done. For purposes, of simple description, I refer to that as biomechanics. I do not claim to be a biomechanics specialist, as I said, except in how these motions are done and the time frames of those motions.
>Q. And, again your work, as reflected in Exhibit Number 6 [Article II], was limited to the area [of] the range of motion and movements associated with, in this particular case, the 11 specific, if I remember correctly, instances of the specific movements of that person?
>A. That's - - that's correct.

(Lewinski Dep., p. 34, lines 22-25; p.35, lines 1-22, attached hereto as Exhibit 2).

>Q. But with respect to the actual firearms expertise, if you will, of the bullet leaving the gun, that's not your area of study or area of expertise?
>A. That's correct. The caliber of the bullets and the rifling, that's correct?
>Q. And neither is the area of your study the trajectory with respect to the field of travel of that bullet once it leaves the gun?
>A. That's correct. That microsecond, submicrosecond perhaps thousands of a second, that's correct.
>Q. Nor is your area of expertise once the bullet hits the human flesh and travels within that human flesh an area of your expertise?
>A. Position of the body as the body rotates through the bullet path is an area of expertise. The path of the bullet through the body, I have to rely upon other people to inform me about that. That's a medical subspecialty.
>Q. And that's a subspecialty you have no expertise in, correct?
>A. That - - that is correct. . . .
>                            * * *
>Q. And with respect to examining a bullet and looking at the fragments on the bullet and trying to determine - - looking at that physical evidence of that bullet as to where that bullet traveled, that's not your area of expertise?
>A. No, that's a subarea of expertise and those people don't have the experience and training, knowledge that I have, done the research that I have. And I haven't done the research that they have.
>Q. Sir, I would just like an answer to my question. Is your area of expertise in examining bullets, and once you have examined those bullets, determining where that bullet went?
>A. That is correct. I can't tell you how a bullet gets deformed. And I understand that but that's not my area of expertise.

(Lewinski Dep., p. 37, lines 5-25; p.38, lines 2-17, attached hereto as Exhibit 2).

7

-***Article III*** ("Biomechanics of Lethal Force Encounters-Officer Movements"), *The Police Marksman*, November/December 2002

In this article, Lewinski stated that: "[t]he primary purpose of this study is to measure the time it takes to do certain motions. This is not the definitive study on the movements and times of officers in lethal force encounters. However, it is very comprehensive." (Article III, p. 19 (p.2), attached hereto as Exhibit 5). Again, as with all his previous articles and studies, Lewinski is solely focused on investigating the specific motions of officers and the corresponding time element associated with the specific muscular activity. As further explained in his deposition:

> Q. So here in the study that is marked as Exhibit Number 7, what you're doing now is measuring the time it takes to do certain specific motions, correct?
> A. Right. I'm looking at how those motions are done, the speed, getting clear and defining what it is that we're actually doing in both subject and officer.
> * * *
> Q. And I'm just trying to understand, specifically, sir, your area of expertise and what you're an expert on. And I just want to understand by looking at the papers and the writings what you do. And isn't it a fact, again, that in Deposition Exhibit Number 7 [Article III], you were studying specifically the mechanics of the muscular activity and the timing with respect to the certain specific motions that you're having these 68 officers from different sections of the Los Angeles Police Department perform?
> A. That's right, how they bring their gun up on target, and et cetera.
> Q. In fact, here in Deposition Exhibit Number 7, in the column on page 1, you list the specific findings of your analysis with respect to the reaction time and the timing of those ranges of motions that are 1 through 20, correct?
> A. That's correct. And there are subcategories of each of those.

(Lewinski Dep., p. 41, lines 2-7; p.42, lines 1-19, attached hereto as Exhibit 2).

-***Article IV and V*** ("Reaction Times in Lethal Force Encounters"), *The Police Marksman*, September/October 2003, and "Reaction Times", *The Police Marksman*, November/December 2003)

In the next two articles, Lewinski reports on his experimental findings involving the use of a "stimulus board" (a black metal box with a pattern of clusters of lights on its face) to stimulate an individual to shoot and stop shooting by means of light patterns. As reported in the first article, "[i]n

8

essence, this experiment in a laboratory setting gives us the minimal amount of time it takes the average officer to start pulling the trigger and to stop pulling the trigger under ideal conditions." (Article IV, p. 26 (p.2), attached hereto as Exhibit 6). And, as summarized in the second article, "[t]he researchers were only interested in measuring reaction to a very neutral situation-in essence to establish simple base rates of reaction time under a variety of circumstances." (Article V, p. 27 (p.4), attached hereto as Exhibit 7). As further explained in his deposition:

> Q. And the experiments that you did was trying to ascertain the minimal amount of time it takes an average officer to pull the trigger and/or stop pulling the trigger, correct?
> A. That's correct. That's a general direction statement.
> Q. And with respect to our next paper, which is Exhibit Number 9 [Article V], this was the same study that you had started in your Exhibit Number 8 [Article IV], with just additional experiments using that same box, correct?
> A. That's correct.
> Q. And, again, the purpose of the study was focusing only in measuring the reaction time, quote, "In essence to establish simple base rates of reaction time under a variety of circumstances," correct?
> A. Primarily psychological circumstances.

(Lewinski Dep., p. 44, lines 12-25; p.45, line 1, attached hereto as Exhibit 2).

In short, Lewinski has absolutely no knowledge, skill, experience, training, or education, to render the opinions concerning the "scenario" of the body positions of Officer Leatherman and Humphrey at the time of the shooting (¶ 3, Expert Report), and the specific chronological shot order and corresponding entry wounds of the shots (¶7 & ¶9, Expert Report). In fact, he implicitly admitted in his deposition the lack of qualifications to testify in this area. Additionally, Lewinski's opinions in this area are not based on any valid reasoning or reliable methodology.

In Gates v. The City of Memphis, 210 F.3d 371, 2000 WL 3777343 (6th Cir. 2000) (unpublished opinion), attached hereto as Exhibit 8, a case involving a tragic fatal shooting of an off-duty police officer by a fellow police officer, the Sixth Circuit reviewed the trial court's decision to

exclude an expert witness. The witness, a former police officer turned forensic consultant, had extensive experience working in a crime lab where he was assigned to the latent fingerprint and firearm tool mark units and also had experience in the reconstruction of shooting incidents. In affirming the district court and finding that the expert witness did not have the requisite qualifications to testify as to the specific shot order and trajectory of the shooting incident, the Sixth Circuit stated:

> In this case, the testimony Mr. Stone was prepared to give was not a general shooting scene reconstruction. As evidenced by Mr. Stone's Rule 26(a) expert report, he was being offered to give testimony on the specific subject of trajectory analysis...In light of the fact that Mr. Stone had never received formal training in trajectory analysis, he had no post-secondary education in physics, anatomy or physiology, and he made no measurements, and had done no scientific testing on this particular shooting scene, the district court did not abuse its discretion in excluding Mr. Stone's proposed expert testimony.

2000 WL 3777343, at *3-4. Lewinski admitted that he has never received any formal training in trajectory analysis and that he has received no post-secondary education in physics, anatomy or physiology. As in the City of Memphis, Lewinski lacks the requisite credentials to testify as to the trajectory of the shots fired, the position of the parties at the time of the shooting, and the nature of the wounds. It is abundantly clear that Lewinski does not have the foundational knowledge, skill, experience, training or education to render opinions and answer questions in this area.

In Dean v. Watson, 1995 WL 692020 (N.D.Ill. 1995), attached hereto as Exhibit 9, the plaintiff contended that a police officer used excessive force without justification when he shot and wounded plaintiff in the right shoulder. The police officer testified that the shooting was an accident caused by the plaintiff running into the police officer and falling down the steps with the officer "belly to belly" when the gun accidently discharged when they both landed at the bottom of the stairs. The plaintiff claimed that the police officer took aim and shot plaintiff while he was approximately ten (10) to fifteen (15) feet away. Defendant sought to qualify an expert, Edwin Bishop, a thirty-two

10

(32) year veteran and deputy superintendent of the Chicago Police Department, to express opinions regarding, among other matters : "(1) the number of shots fired and position of the parties at that time; (2) the nature of the wound sustained by plaintiff and the existence of powder burns; (3) the position in which police officers are taught to hold their weapons. . ." 1995 WL 692020 at *6.

>In carefully analyzing the proffered expert testimony the Court stated:
>
>Plaintiff claims that Defendant is not an expert in forensics and thus lacks the credentials to testify as to the number of shots fired and the position of the parties at that time, and as to the nature of the wounds sustained by Plaintiff and the existence of powder burns. [Bishop] admits in his deposition that he is not an expert on ballistics and trajectory of bullets. . .Bishop admitted that it would be fair to say that he does not hold himself out to be an expert on powder burns, explaining that he had only seen powder burn eight to ten times 15 to 20 years ago. [Bishop] stated that in reaching his conclusions regarding the number of shots fired, the position of the bodies, [footnote omitted] the nature of the wounds and the existence of powder burns, he relied solely on his training experience as a police officer for over 32 years and the files sent to him by [counsel]. Bishop was never at the crime scene around the time of the event in issue. Furthermore, Bishop has not met with anyone with regards to this case other than [counsel]. All of Bishop's testimony is based on the depositions and reports sent to him by [counsel]. ***Based on Bishop's admissions that he is not a forensic expert, Plaintiff's motion in limine is granted as to those portions of Bishop's testimony that require an expertise in forensics***. Id. at *17-19 (emphasis added).

In this case Lewinski admitted that: i) he has absolutely no training or education in forensic shooting reconstruction; (Lewinski Dep., p. 16, lines 17-19, attached hereto as Exhibit 2); ii) he has never been responsible for investigating or processing a crime scene where a shooting has occurred (Id. lines 22-25; and p. 17, lines 1-9); iii) he has absolutely no training or education in the microscopic examination of bullets; (Id. p. 17, lines 10-12); iv) he never did any scene visit or investigation; Id. p. 68, lines 6-14); v) that separate and apart from "what's in his head" his opinions are solely based upon the documents (i.e., depositions, witness statements, police reports, medical examiner's report, and photos) that he reviewed; (Id. p.18, lines 15-25; p.19, line 1); vi) he is not a firearms expert; (Id.

11

p.37, lines 5-9); and vii) he is not an expert in the area of the study of trajectory once a bullet leaves the gun (Id. p.37, lines 10-14). As in Watson, the admissions of Lewinski, at his deposition, preclude him from testifying concerning the body positions of Officer Leatherman and Mr. Humphrey at the time of the shooting (¶3, Expert Report), and the specific chronological shot order and corresponding entry wounds of the shots (¶7 & ¶9, Expert Report).

IV.  *Lewinski's Opinions Are Speculative and Entirely Unsupported by Scientific Knowledge or Grounded In The Methods and Procedures of Science*

In Daubert, the Court explained that "scientific knowledge" implies "a grounding in the methods and procedures of science" which must be based on actual knowledge and not "subjective belief or unsupported speculation." 509 U.S. at 589-90. Moreover, the district court in exercising its "gatekeeping" function should focus on the experts' methodology rather than the conclusions that they generate. See also, General Electric v. Joiner, 118 S.Ct. 512, 519 (1997) ("[t]rained experts commonly extrapolate from existing data. But nothing. . .requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). In addition to exclusion on the basis of the complete lack of the requisite credentials, Lewinski's opinions concerning the body positions at the time of the shooting (¶3, Expert Report), and the specific chronological shot order and corresponding entry wounds of the shots (¶7 & ¶9, Expert Report), should also be excluded because they are speculative and entirely unsupported by scientific knowledge or grounded in the procedures of science.

A. *Body Positions-Time of the Shooting*

In regard to the particular scientific basis and methodology for his opinions concerning the body positions at the time of the shooting, Lewinski testified:

> Q. (By Mr. Burton) But then in that paragraph, you go on to provide some, as you write, "plausible scenarios" with respect to the positioning and location of Officer Leatherman and Mr. Humphrey in regard to this particular encounter, correct?
> A. That's correct.
> Q. Now, the particular opinions in paragraph number 3 are not based upon any investigation of the scene, correct?
> A. That's correct.
> \* \* \*
> Q. What particular scientific study and finding serve as the factual basis for any of your opinions in paragraph number 3?
> A. I refer you to the research that I've done on subject movement in shooting situations and body position as the officer is firing at the subject, how quickly people turn and rotate and what position they get in when they're turning, pulling, moving away, pointing a gun, moving away, having an arm out and moving away.
> \* \* \*
> Q. But none of your studies dealt with any combat situations where there was actually a fight and interaction between two individuals, correct?
> A. Not an actual grappling situation that is correct.

(Lewinski Dep., p. 52, lines 6-14 and lines 18-25; p.53, line 1 and lines 8-11, attached hereto as Exhibit 2).

B. *Shot Order & Entry Wounds of the Shots*

In regard to the particular scientific basis and methodology for his opinions concerning the specific chronological shot order and corresponding entry wounds of the shots, Lewinski testified:

> Q. (By Mr. Burton) . . .What is the data, sir, and the facts that you specifically rely upon from a scientific analysis to serve as a factual basis your opinions that I just read. . ., that were the opinions in paragraph 7. . .?
> A. Some of the - - some of the foundation for my analysis comes from the studies that we have gone through, speed of shooting position, several studies that Honig and Artwohl have done on memory of officers's position, placement, my clinical interviewing of officers. Actually, some of my martial arts experience comes in here. I've been in martial arts for - - well, since 1966. And part of that almost 40 years of study involves empty hand control of a subject and how people grab and pull and the body positions. And in essence, in my professional experience and training, I looked at this situation, examined this situation,

13

combined all of that data to see where those two bodies would engage in space that would present the shot pattern on Mr. Humphrey's body.

(Lewinski Dep., p. 71, lines 5-25; p.72, lines 1-3, attached hereto as Exhibit 2).

> Q. But your area of study in that respect is in the fields that we've discussed earlier today which deals with the physical movement of an individual and the specific reaction times that we've entered into the record earlier today, correct?
> A. That is - - that is correct.
> Q. Now, with respect to that field of work and what your expertise purports to be, what is your explanation with respect to how one of the bullets was recovered at the scene directly next to Mr. Humphrey's body?
> Q. I wasn't asked to explain that bullet. I was asked to examine the bullet impact points and do my analysis on those impact points and body placement. That's my understanding of what I was requested to do.
> Q. But isn't it a fact, sir, that to take into account an opinion with respect to the rounds that were fired and which shots entered Mr. Humphrey from the gun that was fired by Officer Leatherman, one has to take into account all the bullets that were fired, correct?
> A. That is correct. There were ten rounds fired. That is correct. We don't know where many of them went and, after they left the body, we don't know what happened to them either. And that's not my forte, once they leave the body.
> Q. Isn't it a fact that we do know, as a matter of fact, that one of the bullets that were fired from Officer Leatherman's gun that went into the body of Mr. Humphrey was a bullet that was found right next to his body where his body lay, correct?
> A. I understand that, yes.
> Q. And you have undertaken no analysis, no investigation to account for that particular bullet correct?
> A. That's correct.

(Lewinski Dep., p. 75, lines 1-25; p.76, lines 1-8, attached hereto as Exhibit 2).

> Q. What specific scientific reports, writings, or studies can you identify that are in addition to the exhibits that we've introduced as part of this deposition today that serve as a basis for any of your opinions in this matter?
> A. Well, I suggest further that you take a look, as I said, at our news line for some of the information, not the biomechanics, not the action-reaction parameters although we are extending our research on that considerably at this point. But you'll find several references on our news line to work that we are engaged in and what we are doing. And you will find illustrations there as well of some of our stuff. So I don't believe that its restricted just to this; but –
> Q. With respect to those news lines, do those contain any additional specific scientific studies and findings that you've done?
> A. We have, yes, we have done considerable work on attention issues, memory issues, concentration issues, eye track patters, what an officer can report and not report. And we have

14

> reported considerably on our analysis and application of research done outside the area to the field of law enforcement.
> Q. All the areas you just mentioned, though, sir, are outside of the biomechanics and the movement issues that serve as a basis for the area in paragraph number 7, though, correct?
> A. Okay, if we're looking just at number 7, yes, that is correct.

(Lewinski Dep., p. 85, lines 2-25; p.86, lines 1-5, attached hereto as Exhibit 2).

As this testimony demonstrates, the opinions of Lewinski are speculative and entirely unsupported by any reliable clinical experience or scholarly literature. Furthermore, the reasoning and methodology underlying the testimony is not scientifically valid. In short, the opinions are not the product of any reliable principles and methods. In Aguilar v. Dixon, 1995 WL 319621 (N.D.Ill. 1995), attached hereto as Exhibit 10, the plaintiffs contended that police officers used excessive force in connection with arresting them when shots were fired at a car. The plaintiffs intended to offer an expert to testify as to the physical evidence, including the damage to the car, the shell casings from one of the officer's gun, ballistics, and the bullet trajectory. In ruling on the admissibility of the expert, the court stated:

> The expert may be qualified not only by education or certification, but by experience. [citation omitted] Dr. Siegesmund is a professor of anatomy at the Medical College of Wisconsin in Milwaukee. He teaches medical neuroanatomy, medical histology, and forensic science, and is the author of numerous publications, many in the field of histology and electron microscopy. Defendants object to Dr. Siegesmund's testimony concerning ballistics; specifically to the position of the shell casings and bullet trajectories. None of his publications is in the field of ballistics. He has, however, taught courses containing ballistics, and studied in the area. His knowledge of ballistics appears to center mostly around microscopic comparison of the markings found on the bullets. He may testify concerning such markings. Plaintiffs have not offered a scientific basis for his opinions concerning bullet trajectory. Nor have they done so for his opinions concerning the pattern of shell casings from Dixon's [the police officer] gun. There is some dispute as to whether Dixon fired on the run or from a stationary position. Dr. Siegesmund's opinions on these matters do not appear to have sufficient scientific support to be of assistance to the trier of fact.

The analytical gaps in Lewinski's opinions, as in Dixon, are too broad a leap for this Court

15

to make without ending up in the black hole of "junk science". Lewinski's testimony cannot endure under the strictures of Daubert and FRE 702. In this particular case, the "expert" opinion evidence of Lewinski is connected to existing data only by the *ipse dixit* of the expert.

V. *Conclusion*

Plaintiff respectfully requests that the Court exclude all the "expert" opinions of Dr. William Joseph Lewinski ("Lewinski"), set forth in his expert report (save and except his opinion that an average officer will discharge ten (10) rounds from a firearm in a time of two and one half to three seconds) for the foregoing reasons.

                                                s/Robert Burton
R. THOMAS SEYMOUR, OBA #8099
C. ROBERT BURTON, OBA #14195
SCOTT A. GRAHAM, OBA # 19817
**THE SEYMOUR LAW FIRM**
100 West 5th Street, Suite 550
Tulsa, Oklahoma 74103
(918) 583-5791

-and

John C. Harris
P.O. Box 52206
Tulsa, Oklahoma 74152
(918) 447-2747

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

  I hereby certify that on the 1st day of July, 2005, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Larry V. Simmons, Esq.
Mike Romig, Esq.
Deputy City Attorney
200 Civic Center, Room 316
Tulsa, Oklahoma 74103

                   s/Robert Burton
                   Robert Burton